QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Dominic Surprenant (Bar No. 165861)
  ds@quinnemanuel.com
  Michael L. Fazio (Bar No. 228601)
  michaelfazio@quinnemanuel.com
  Paul Slattery (Bar No. 285291)
  paulslattery@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100

*Attorneys for Plaintiff*
*Tradeline Enterprises Pvt. Ltd.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| TRADELINE ENTERPRISES PVT. LTD., <br><br> Plaintiff, <br><br> vs. <br><br> JESS SMITH & SONS COTTON, LLC; and J.G. BOSWELL COMPANY, <br><br> Defendants. | CASE NO. 2:15-CV-8048 <br><br> **COMPLAINT FOR ANTITRUST VIOLATIONS UNDER SECTION 1 OF THE SHERMAN ACT, and DEMAND FOR JURY TRIAL** <br><br> Trial Date:        None Set |

Tradeline Enterprises Pvt. Ltd. ("Tradeline") brings this action to redress the harm caused by Defendants' conspiracy with unnamed co-conspirators to disparage Tradeline's products for the purpose, and with the effect, of causing Tradeline to lose valuable contracts. The conspirators used Tradeline's resulting financial difficulty as a pretext to summarily strip Tradeline of a license Tradeline needed to sell its products, while providing Tradeline none of the procedural safeguards provided in the license agreement, causing the rapid collapse of Tradeline's otherwise profitable and expanding Supima cotton business.  Defendants' conspiracy is a classic example of a *per se* illegal group boycott.

Tradeline brings this action for violations of the Sherman Act against Defendants, Jess Smith & Sons Cotton, LLC ("Jess Smith Cotton") and J.G. Boswell Company ("Boswell Co.") (collectively, "Defendants").  Upon knowledge with respect to its own acts and upon information and belief with respect to all other matters, Tradeline alleges in support of its claims against Defendants as follows:

## NATURE OF THIS ACTION

1.     Defendants' conspiracy can be thought of as a *procedural* conspiracy and a *disparagement* conspiracy, both *per se* illegal because they were intended to result, and in fact resulted, in Tradeline losing a license that was necessary for it to compete in the market relevant to this case.  Without the license, Tradeline's business in the relevant market immediately collapsed.

2.     Defendants' procedural conspiracy and disparagement conspiracy, while part of one conspiracy as a matter of fact, are independently actionable as a matter of law.  Tradeline expects to prove both parts of a unified conspiracy, but even without discovery, facts that Tradeline could establish today prove Defendants acted in concert with unnamed co-conspirators to deprive Tradeline of important procedural rights provided by the relevant license agreement, which rights, if provided, would have prevented the collapse of Tradeline's Supima cotton business.

3.     Tradeline is a registered Indian company run by Prashant Palayam,  a third generation "spinner," or a manufacturer of yarn from cotton fiber, in Chennai (formerly known as Madras), India.  Defendant Jess Smith Cotton is a cotton merchant in Bakersfield, California; it buys cotton from cotton farmers (or "growers") and sells the cotton to spinners (who turn cotton in yarn) or textile mills (who turn yarn into fabric).  Defendant Boswell Co. owns the world's largest privately owned farm, consisting of 135,000 acres in Kings County, California, where it grows, among other crops, American Pima cotton.   Unnamed co-conspirator Supima Association of America ("the Association") is composed of

cotton growers and cotton merchants, although its Board of Directors is composed only of representatives of cotton growers.

4.     The Association's goal is to brand American Pima cotton as the world's premier cotton.  "Supima®" is the licensed trademark of the Association; it is a portmanteau combining the first syllable of "Superior" and the word "Pima".  The trademarked name is used by the Association to promote and market textile and apparel products made with 100 percent American Pima cotton and certain American Pima cotton blends.  The Association provides licensing agreements to spinners, textile mills, manufacturers, brands and retailers for the purpose of promoting apparel and textile products in high-end retail outlets.  In the industry, and in this Complaint, American Pima cotton is referred to as "Supima cotton."  As the Association states on its website (www.supima.com), "[t]he Supima® trademark is your guarantee that the product contains Supima, the world's finest cotton.  No other trademark can guarantee a product's luxury cotton content."  The website also states:  "Often referred to as 'the cashmere of cottons,' Supima surpasses all other cotton in softness, strength, and brilliance of color."[1]

5.     In 2005, the Managing Director of Tradeline, Praschant Palayam, identified a significant market opportunity using Supima cotton in an unconventional way.  Supima cotton had traditionally been used for high-end items, such as tailored dress shirts and high thread count sheets.  Palayam realized that if Tradeline produced lower thread count Supima cotton yarn, it could sell it to textile mills who would in turn sell the Supima cotton fabric to garment makers to produce casual apparel items (polo shirts, jeans, undergarments) at substantially higher prices.  The increased prices Tradeline could charge for its yarn would easily more

---

[1]   This Complaint uses "Supima®" when referring to the trademark or related licenses and "Supima" when referring to the cotton or industry more generally.

than offset Tradeline's increased costs from obtaining a Supima® license and paying the higher costs of Supima cotton over normal "upland" cotton.

6.   By 2008, Tradeline had obtained a Supima® license and invested $10 million in building a new factory designed specifically to produce Supima yarn (Supima cotton is roller-ginned, not saw-ginned like upland cotton).  Tradeline's Supima business grew quickly and profitably; by 2010, it had Supima cotton revenues of almost $20 million and profits of over $2 million.

7.   By August 2010, Tradeline had become one of the largest purchasers of Supima cotton in Asia.  At that point, Tradeline's Palayam approached Jeff Elder, both the Head of Marketing for Defendant Boswell Co. and the Chairman of the Association, and provided him a "thesis" (the "Thesis") on his plans for Supima cotton.  That same month, he emailed a similar proposal to Marc Lewkowitz, Executive Vice President of the Association.  In essence, Palayam was proposing a form of vertical integration, contemplating that with the Association's assistance, Tradeline would bypass the cotton merchants like Jess Smith Cotton and buy Supima cotton directly from the Supima® licensed cotton farms.  Palayam also requested Marc Lewkowitz to share Palayam's Thesis with Jesse Curlee, President of the Association, in an email dated September 2, 2010.

8.   Palayam thought his Thesis would be viewed positively by Elder and the Association, as it sought to deepen and broaden the sale of Supima cotton in Asia, the world's largest market for cotton generally and Supima cotton in particular.

9.   Palayam didn't sufficiently appreciate that Elder, the Head of Marketing for Boswell Co. in addition to being the Chair of the Association, and the Association itself, would view Tradeline's plan as disruptive to the Association's cotton grower members, especially Boswell Co., by far the largest grower, and to the Association's cotton merchant members.  The plan challenged the comfortable status quo of the Association and its alliance between cotton growers and merchants,

in much the same way Uber is "disruptive" in that it challenges the comfortable status quo of local taxi and limousine companies, although Tradeline provided, and Uber provides, the customer a more highly valued product at a competitive price.

10. Palayam's Thesis not only threatened middlemen cotton merchants like Jess Smith Cotton, it also threatened Boswell Co. Boswell Co. sells its Supima cotton directly to purchasers. Palayam's Thesis would have introduced competition and increased efficiency by bypassing the middlemen merchants. This in turn would have required Boswell Co. to lower the price for its Supima cotton to meet the lower prices that would prevail in a market less dependent on the middlemen cotton merchants. The beneficiaries of the Thesis would have been not only Tradeline (and others who would have copied its successful business model) but also the commercial retailers and the ultimate consumer.

11. The Association, along with and under the control of Jess Smith Cotton and Boswell Co., subsequently engaged in concerted action to (a) deprive Tradeline of important procedural rights Tradeline had pursuant to its License Agreement with the Association and thereby (b) allow the co-conspirators to conceal the falsity of their disparagement of Tradeline products. Defendants and the Association engaged in this conduct for the purpose and with the effect of causing Tradeline to lose important customers and potential contracts, with the aim of casting Tradeline into financial difficulty and using that as a justification to strip Tradeline of its Supima® license.

12. The conspiracy entered into by Defendants and the Association worked. On March 1, 2012, the Association revoked Tradeline's Supima® license, and Tradeline's Supima cotton business came to a crashing halt.

13. Tradeline seeks $100 million in pre-trebled damages (or a larger amount to be proven at trial), its reasonable attorneys' fees and such other relief that the Court may find is just and proper.

**JURISDICTION AND VENUE**

**A.    Subject Matter Jurisdiction and Standing**

14.    This action is brought by Plaintiff, Tradeline, under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages, costs, and attorney's fees for the injuries sustained by Tradeline resulting from violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

15.    This Court has subject matter jurisdiction over federal antitrust claims under 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337(a).

16.    Plaintiff has standing to bring these claims under 15 U.S.C. § 15(a) and 15 U.S.C. § 1125(a) because it has sustained injuries to its business and property that were a direct and proximate result of Defendants' violations of the antitrust law.

**B.    Personal Jurisdiction**

17.    This Court has personal jurisdiction over Defendant Jess Smith Cotton. Jess Smith Cotton is a limited liability corporation, having its headquarters in Bakersfield, California.  The illegal conduct in which Jess Smith Cotton engaged and which is the subject matter of this Complaint occurred principally, if not exclusively, in the State of California.

18.    This Court has personal jurisdiction over Defendant Boswell Co. Boswell Co. is a private company that owns the world's largest privately-held farm in Kings County, California and is headquartered in Pasadena, CA.  The illegal conduct in which Boswell Co. engaged and that is the subject matter of this Complaint occurred principally, if not exclusively, in the State of California.

**C.    Venue**

19.    Venue is proper in this District under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, as well as 28 U.S.C. § 1391(b)-(d) because during the relevant time period:  (a) Defendants transacted business in this District; (b) a substantial portion of the affected commerce described herein was carried out in this

1   District; and (c) a substantial part of the events or omissions giving rise to the claims
2   occurred in this District.

3       20.     Both Jess Smith Cotton and Boswell Co. ship all or virtually all of their
4   Supima cotton for export through either the Port of Long Beach or the Port of Los
5   Angeles, both within this District, including the cotton shipped pursuant to the
6   contracts between Tradeline and Jess Smith Cotton and, separately, the contracts
7   between Tradeline and Boswell Co., described in this Complaint.

8       21.     The key event that triggered the conspiracy — Tradeline's Palayam's
9   explanation of his Supima cotton Thesis involving a proposal by Tradeline that the
10  Association assist it in buying Supima cotton crops directly from small farms,
11  thereby threatening cotton merchant middlemen like Jess Smith Cotton as well as
12  Boswell Co. — occurred on or around August 2, 2010 in Boswell Co.'s private jet
13  flying between Boswell Co.'s farm and the Santa Monica Airport, as well as in the
14  Santa Monica Airport itself.

15      22.     Finally, Boswell Co. is headquartered in Pasadena, CA, and venue is
16  therefore proper with respect to Boswell Co. within this District.  Further, if the
17  Court has personal jurisdiction over one conspirator, it consequently has personal
18  jurisdiction over co-conspirators.  The same analysis applies to venue, and venue is
19  therefore proper within this District with respect to Jess Smith Cotton.

20                              **THE PARTIES**

21      23.     Plaintiff, Tradeline Enterprises Pvt. Ltd., is a Private Limited Company
22  organized under the laws of the Republic of India.  Its registered office is in
23  Chennai, Tamil Nadu, India.

24      24.     Defendant, Jess Smith & Sons Cotton, LLC, is a California limited
25  liability company.  Its headquarters are in Bakersfield, California.

26      25.     Defendant, J.G. Boswell Company, is a private company organized
27  under the laws of the State of California.  Its headquarters are in Pasadena, CA.

28

## __UNNAMED CO-CONSPIRATORS__

26.     Various other persons, firms and corporations, who currently are not named as defendants in this action, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy in violation of the antitrust laws.  Some of these persons, firms and corporations are as yet unidentified.

27.     The unnamed co-conspirator which is a principal actor in the conspiracy is the Supima Association of America.  The Association has its principal place of business at 4141 East Broadway, Phoenix, Arizona 85040-8831.  The Association is the owner of the registered trademark "Supima" in relation to apparel, home furnishings, fabrics, yarns and threads.  The Supima Association has a Board of Directors composed of 11 producers of American Pima cotton: seven from California, two from Texas and one each from Arizona and New Mexico.

28.     As discussed in the Nature of This Action *supra*, the aim of the Association is to promote the registered Supima trademark and brand and therefore to promote the sale of Supima cotton.  In practice, however, that legitimate aim was trumped by an illegitimate one that took precedence:  protecting the Association's cotton grower members and cotton merchants from competition.

29.     During the relevant time period, Boswell's Co.'s Head of Marketing, Jeff Elder, was Chairman of the Board of the Association.  Also during the relevant time period, Jim Neufeld, who was a cotton grower for Jess Smith Cotton and a member of the Board of Jess Smith Cotton, was also a member of the Association's Board.  As alleged below, both Elder and Neufeld took active steps in furtherance of the conspiracy, Elder for the benefit of Boswell Co. and Neufeld for the benefit of Jess Smith Cotton.  Both manipulated the Association to further their respective companies' desires to avoid competition, and they did so with the active agreement and participation of the Association itself.

## BACKGROUND FACTS

**A.**     **Tradeline Recognizes A Successful Opportunity In Supima Cotton And Successfully Executes Its Plan.**

30.     In 2005, Prashant Palayam, the Managing Director of Tradeline, identified a significant business opportunity for Tradeline to pursue, involving manufacturing Supima cotton yarns and fabrics for innovative uses.

31.     In 2008, Tradeline invested $10 million to build a factory in Chennai, India, for the specific purpose of producing yarns from 100 percent Supima cotton.

32.     In 2008, Tradeline first received its license from the Association pursuant to a standard license agreement (the "License Agreement"). The License Agreement contained 15 articles and was nine pages long. By far the longest and most detailed article was Article 4, "Control and Inspection."

33.     Article 4 provided detailed protocols by which the Association could inspect and test Tradeline's licensed Supima® cotton yarns to ensure that they were produced with 100 percent Supima cotton.

34.     The Article 4 protocols also provided Tradeline significant procedural protections: they ensured that the Association would inspect and test Tradeline's products in Tradeline's presence and that a chain of custody would be maintained establishing that the inspected and tested products were indeed Tradeline's. The License Agreement provided no other protocol for the Association to inspect and test Tradeline's products.

35.     By 2010, Tradeline's Supima cotton business had grown substantially and profitably. In August 2010, Tradeline commissioned Technopak Advisors Pvt. Ltd. ("Technopak"), a consulting firm with strategic planning expertise in the Indian textile industry, to prepare an assessment of the future of Supima cotton. Among other findings and recommendations, Technopak reported:

        a.     Supima cotton is the only extra long staple ("ELS") cotton in the world that is trademarked and marketed according to its origin, variety and

quality, which provide it credibility and branding in the market place that other ELS cotton cannot match.

b.     Supima cotton offers co-branding opportunities throughout the entire value chain, from spinning to retail.

c.     There is little increase in cost of production using Supima cotton. The only increase is the fiber cost and cost of the Supima® license, which is minimal in relation to the increased prices at which Supima cotton yarn, fabric and garments can be sold.

d.     Asia, especially China and India, accounts for the majority of Supima cotton exports.

e.     There had been a shift of manufacturing bases to Asia due to cost savings.

f.     China and India were also spurring the demand for Supima cotton due to their respective large domestic markets.

g.     The majority of spinners in China and India produced only for internal use and sold only small quantities outside their country's boundaries.

h.     There was a strong demand for standalone spinning mills to cater to the integrated textile and apparel mills.

36.    Technopak's findings and recommendations confirmed that Tradeline had positioned itself to be one of the key providers of Supima cotton yarns in the rapidly growing Asian Supima cotton markets.

**B.     Tradeline Approaches Boswell Co. and the Association With An Innovative Plan Intended To Broaden the Scope and Deepen the Demand For Supima Cotton But Which Boswell Co. and the Association Viewed As Disruptive.**

37.    In August 2010, Palayam, on behalf of Tradeline, arranged to meet with Jeff Elder, both the Head of Marketing for Boswell Co. and the Chairman of the Association's Board of Directors.  By this time, Tradeline had become one of the

largest purchasers of Supima cotton in Asia and had entered into two Supima cotton contracts with Boswell Co., one on May 16, 2008 for 36 metric tons and one on April 17, 2009 for 360 metric tons.  Boswell Co. shipped the cotton pursuant to these contracts through ports in this District (either the Port of Los Angeles or the Port of Long Beach).

38.     Palayam landed in Los Angeles International Airport on or about August 2, 2010 and was picked up at his hotel by a private driver sent by Elder, who drove Palayam to the Santa Monica Airport, where Boswell Co.'s private jet flew Palayam to his meeting at Boswell Co.'s farm in Kings County, California.

39.     During Palayam's August 2, 2010 meeting with Elder at the Boswell Co. farm, in the Boswell Co. private jet flying Elder and Palayam back to the Santa Monica Airport, and at the airport, Tradeline's Palayam described orally his Supima cotton Thesis, which he later reduced to writing and emailed to Elder.

40.     Palayam's Thesis called for Tradeline to vertically integrate – in other words, to enter into direct contracts with small farmers which, in the aggregate, produce a substantial percentage of all Supima cotton.  With these contracts, Tradeline would "tie up" the production by paying for the input (seed) costs and buying out the entire cotton harvest from these farms at pre-fixed rates, thereby eliminating cotton merchant middlemen like Jess Smith Cotton.

41.     As a buyer of Supima cotton from India, Tradeline did not have access to small Supima cotton farms. One role of the Association is to connect the growers with the buyers, as both must be Supima® licensees.  Tradeline correctly understood any effort to contact Supima cotton growers directly, without the assistance and approval of the Association, would likely have been unsuccessful and would have risked alienating the Association as well.

42.     Tradeline's proposed business plan posed a direct threat to the cotton merchant members in the Association, as well as to Defendant Boswell Co., which also acted as a merchant and controlled certain small farms, and which risked

suffering significant price deterioration as the largest grower of Supima cotton if Tradeline's Thesis and business plan succeeded.

43.     On August 28, 2010, Tradeline's Palayam emailed Marc Lewkowitz, the Association's Executive Vice President, proposing that the Association assist Tradeline in "tieing up with the farms directly for buying [Supima cotton] fiber." Palayam's email explained that the benefit of the proposal for the Association and its members would be to broaden the scope and depth of Supima cotton penetration into the lucrative Asian markets.

44.     Both Elder, Head of Marketing for Boswell Co. and Chairman of the Association's Board of Directors, and Lewkowitz, Executive Vice President of the Association, understood that Tradeline's Thesis and business plan posed a threat to the cotton merchant members of the Association and to Boswell Co. itself.  Both disregarded the fact that the Thesis was intended to and in fact would have furthered the only legitimate goal of the Association – broadening and deepening the market demand for Supima cotton.

45.     Accordingly, they agreed that Lewkowitz and others at the Association would monitor Tradeline's activity in the marketplace and that the Association would take action to intervene if it appeared Tradeline was in a position to successfully execute on its business plan.

C.     **Tradeline Enters Into Substantial Contracts for Supima Cotton With Cotton Merchant and Association Member Jess Smith Cotton.**

46.     Prior to the time Tradeline's Palayam provided his Supima cotton Thesis to Jeff Elder, Head of Marketing for Boswell Co. and Chairman of the Association's Board of Directors, on or about August 2, 2010, Tradeline had fully performed on six contracts with Defendant Jess Smith Cotton for a combined amount of 482 metric tons of Supima cotton.  Jess Smith Cotton shipped all of that cotton through ports in this District.

47.     Between August 2010 and March 2011, Tradeline entered into an additional five contracts with Jess Smith Cotton, agreeing to purchase a total amount of 1250 metric tons of Supima cotton.

48.     All of these contracts called for Tradeline to either (a) pay for the cotton before it was shipped from the Port of Los Angeles or the Port of Long Beach to Chennai, India or (b) pay for the cotton before taking possession of it in Chennai. In no event would Tradeline be allowed to take possession of the Supima cotton pursuant to its contracts with Jess Smith Cotton prior to paying for it.

49.     The contracts between Jess Smith Cotton and Tradeline were to play a significant role in the development of the conspiracy among the Association, Boswell Co. and Jess Smith Cotton, including by affecting the timing of when Jess Smith Cotton joined the conspiracy. It would not have been in Jess Smith Cotton's interests to have the Association revoke Tradeline's Supima® license before the contracts had been performed. It would have been and was in Jess Smith Cotton's interests to misuse the Association by having it threaten to revoke Tradeline's license to create leverage to force Tradeline to perform on the Jess Smith Cotton contracts at a time when Defendants' conspiracy had financially weakened Tradeline through disparagement of its products, as alleged *infra*.

50.     In other words, the contracts Tradeline entered into with Jess Smith Cotton in the fall and winter of 2010-2011 for a time served to delay the co-conspirators execution of the goal of the conspiracy: for the Association to strip Tradeline of its Supima® license if Tradeline appeared positioned to execute on its disruptive business plan.

**D.**     **Tradeline Appears Poised to Obtain A Significant Contract With Mitsubishi Living Essential Group On Behalf of Uniqlo, The World's Largest Consumer of Supima Cotton Products And Potentially To Enter Into A Long Term Joint Venture With Those Parties.**

51.     Uniqlo is a Japanese casual wear designer, manufacturer and retailer.  It operates in more than fourteen countries worldwide, is among the largest retailers of private label apparel in the world, and is the world's largest retailer consumer of Supima cotton products.

52.     In 2010 and 2011, Yoshikazu Nishikawa worked for Mitsubishi's Living Essential Group ("Mitsubishi Living").  Mitsubishi Living conducts business operations that take into account the product flow through entire industries, from the upstream sourcing of resources to the downstream retail markets.  Mitsubishi Living's website states that the Group "place[s] a strong emphasis on the reliability and safety of the products and services we provide."

53.     In the fall of 2010 and spring of 2011, Nishikawa was tasked by Mitsubishi Living to buy Supima cotton yarn and fabric (the "upstream resource"), provide it to garment markers and then provide the finished Supima cotton garments to Uniqlo.  In 2011, a joint venture between Mitsubishi Living and a subsidiary of Uniqlo was created for the purpose of strengthening the relationship between the two companies.

54.     Beginning in October 2010, Nishikawa began email negotiations with Tradeline to purchase a significant amount of Supima cotton yarn to be used for the production of fabric and garments to be purchased ultimately by Uniqlo.

55.     On November 8, 2010, Nishikawa emailed Tradeline:  "We have just returned from U.S. SUPIMA cotton farm tour.  It was very impressive trip for us n we hope we can start Uniqlo Supima yarn project with you for next year."

56.     Mitsubishi Living also sent technicians to customize Tradeline's factory to meet its specific requirements, spent as much as $1 million sampling yarns around the world, and sent its General Manager to visit Tradeline.

57.     On December 23, 2010, Nishikawa emailed Tradeline:  "once quality is satisfactory to Uniqlo n price is reasonable, definitely we can start the business."

58.    On April 10, 2011, Nishikawa emailed Tradeline: "Your quality is approved n customer is ready to discuss about the price for about 1,000 tons."

59.    On April 27, 2011, Nishikawa emailed Tradeline, stating it was planning on purchasing 700 tons of Supima cotton yarn from Tradeline for Uniqlo from June through December 2011, and that "Customer almost decided to use Tradeline."

60.    During this same time frame, Nishikawa also indicated to Tradeline that it was in a position to place large orders for Tradeline's Supima cotton yarn for AEON, a major Japanese apparel retailer, Hansol, a fabric mill in South Korea, and Fortune Essence, a fabric mill in Hong Kong.

61.    In February 2011, Lazard (India) prepared a proposal to Mitsubishi Corporation to partner with Tradeline, with the aim of "provid[ing] Mitsubishi Corporation an interest in the world's largest dedicated Supima facility in a strategic region — India." Lazard proposed Mitsubishi obtain a 20 percent interest in Tradeline for $20 million.

62.    In November and December 2010, Palayam on behalf of Tradeline and Nishikawa on behalf of Mitsubishi Living had email discussions about Mitsubishi taking a long term position in Tradeline for purposes of servicing Uniqlo's textile mills and garment makers. In February 2011, Nishikawa confirmed that Uniqlo was interested in establishing a long term relationship with Tradeline. Tradeline responded by offering to come to Japan with Lazard (India) to present the proposal that Lazard had prepared.

63.    Nishikawa responded on February 11, 2011, confirming that he and his superior, Mr. Yanagawa, were interested in the Lazard proposal, but proposing an initial investment of $5 million for a lower percentage interest.

64.    At the end of March 2011, Palayam and the Lazard (India) team flew to Japan and presented to Yanagawa and Nishikawa. Yanagawa was impressed and stated he would arrange a meeting in May or June 2011 between Uniqlo, Lazard,

Case No. 2:15-CV-8048
COMPLAINT FOR ANTITRUST VIOLATIONS

Tradeline and Mitsubishi Living to discuss a long term relationship between Uniqlo and Mitsubishi Living on the one hand and Tradeline on the other.[2]

65.    The Association, its President Jesse Curlee and its Executive Vice President Marc Lewkowitz would have been informed of these developments.  It was standard procedure for Supima cotton buyers, like Mitsubishi Living, to communicate to the Association potential and actual Supima cotton contracts with cotton farmers, merchants, spinners and textile mills.  The Association would also have expected a buyer like Mitsubishi Living to keep it informed about potential or actual contracts with brands and retailers, like Uniqlo.  What is more, the Association, through Lewkowitz, originally introduced Tradeline to Mitsubishi Living.  Curlee and Lewkowitz in turn would have communicated these developments to the Association's Board and its Chairman, Boswell Co.'s Jeff Elder.

66.    In sum, by April 2011, Tradeline was poised to enter into a contract to provide the world's largest consumer of Supima cotton products with 700 tons of Supima cotton yarn (the Supima cotton input into that amount of yarn would be over 1000 tons of Supima cotton), and it was poised to potentially to enter into substantial contracts with three other large Asian apparel manufacturers.  It also had a real and present potential to enter into a partnership with Mitsubishi, one of the largest corporations in the world, and/or Uniqlo, the world's largest retailer consumer of Supima cotton products.

67.    What is more, these developments were known to the Association's Chairman, Jeff Elder of Boswell Co., the Association's President Jesse Curlee and

_____

[2]    As alleged in detail below, in late April or May 2011, the Association emailed Mitsubishi Living or Uniqlo, or both, disparaging Tradeline's products and (falsely) stating it was in the process of revoking Tradeline's Supima® license.  That communication extinguished what had been a growing interest by Mitsubishi Living and Uniqlo to enter into a long term partnership with Tradeline.

the Association's Executive Vice President Marc Lewkowitz.  The Association, as is true for most industry associations, had and has a small staff, with only four employees at its headquarters in Phoenix and one employee at its office in New York.  As a consequence, the Board, and especially the Board's Chairman, Elder, worked closely with Curlee and Lewkowitz, and Curlee and Lewkowitz engaged in the conduct towards Tradeline detailed in this Complaint under the direction and control of Elder.  If Tradeline were to have entered into the Mitsubishi/Uniqlo contracts, and potentially other contracts with other major Asian apparel manufacturers, as well as a long term relationship with Uniqlo and/or Mitsubishi Living, it would have been solidly positioned to execute on Palayam's Thesis and to vertically integrate the supply chain by dealing directly with cotton growers.  It was time for Boswell Co. and the Association to act on their plan to disparage Tradeline and strip it of its Supima® license.

> **E.**      **The Association Breaches the License Agreement, Disparages Tradeline's Products and Interferes With Tradeline's Business.**
>
> > **1**.      **The Association breaches the License Agreement by surreptitiously testing product for Fortiustex.**

68.      Fortiustex is a textile mill in Porto, Portugal.  It had purchased Supima cotton yarn from Tradeline on a number of occasions by the spring of 2011 without any problems with contract performance on either side.

69.      In or about March 2011, either on his own or at the urging of the conspirators, Andres Skovbon of Fortiustex purported to send Supima cotton yarn received from Tradeline to Marc Lewkowitz, Executive Vice President of the Association, for testing to confirm it was 100 percent Supima cotton.[3]  In breach of

---

[3]   In this Complaint, Tradeline is taking a conservative view of the evidence. Discovery may disclose that Fortiustex (and other entities mentioned in this Complaint) at some point became active participants in the conspiracy.  If that should occur, Tradeline will promptly move to amend the Complaint.

the License Agreement, and without informing Tradeline, its longtime licensee, the Association tested the samples and reported the results to Fortiustex's Skovbon on March 18, 2011.

70.     Of the seven samples that the Association tested, it reported to Fortiustex that five samples conformed, one was a "blend," and one "does not conform."

71.     While the tests, purportedly of Tradeline's yarn, showed one blend and one non-conforming yarn, with five confirmed Supima cotton samples, Fortiustex apparently wanted more negative results.  It sent another batch of yarn to the Association for testing.  The Association, again without informing Tradeline, dutifully tested the new samples, again without seeking to establish and maintain any chain of custody.  The second set of tests purported to show all eight yarns were "NOT SUPIMA."

72.     The Association twice testing the Fortiustex samples was highly irregular for both legal reasons (it violated the letter and spirit of the Tradeline/Association License Agreement) and, given the Association did not even inform Tradeline of its agreement to test the alleged Tradeline products or the results of the tests, as a matter of basic business courtesy.

73.     The License Agreement had explicit and detailed protocols for the Association to test whether Tradeline's yarn was 100 percent Supima cotton.  These protocols ensured, among other things, that the Association would know that what it was testing was *Tradeline*'s yarn.  These protocols also should have provided Tradeline an opportunity to show by its business records or otherwise that the input to the yarn was 100 percent Supima cotton.

74.     By sharp contrast, nothing connected the Fortiustex samples to Tradeline other than Fortiustex's say-so.  Fortiustex could have provided non-Tradeline samples to the Association in bad faith for its own reasons, or at the

urging of one of the conspirators, or Fortiustex could have accidently contaminated the samples at the Fortiustex mill in Portugal with yarn from other spinners.

75.     The Association's breach of basic business courtesy is yet more obvious.  As of March 2011, Tradeline had been a licensee of the Association for over three years and had purchased nearly 6500 metric tons of Supima cotton from Association members.  Yet the Association's Lewkowitz tested Fortiustex's samples, without a shred of evidence of chain of custody linking the samples back to Tradeline and reported non-confirming test results to Tradeline's customer, all behind Tradeline's back.

76.     The results of the Association's clandestine testing of the Fortiustex's samples were in some respects as one would expect and in other respects hard to explain absent conspiracy.

77.     On the one hand, Fortiustex's Skovbon claimed large financial losses, threatened to sue and complained bitterly about his customers' loss of confidence and dissatisfaction (e.g., "I can be very affraid [sic] what my customers ARMANI – TRUSSARDI – STEFANEL – MARCO POLO will say if they find that we are wrongly SELLING AND LABELLING the garments we make for them and what legally can happen!"; "We have lost a lot of face (consentquently [sic] orders)"; and "Actually I was called to a  meeting with the very top of the Armani Group to explain how this could go so wrong").

78.     On the other hand, Skovbon refused several offers by Tradeline to replace the challenged shipments, which would have required Fortiustex to return the challenged shipments to Tradeline.  Fortiustex's refusal to accept a fresh shipment of product in exchange for returning the allegedly defective shipments strongly indicates that Fortiustex in fact had used the yarn and that the entire incident may have been nothing more than a ruse.

79.     What is more, after episodic complaining emails and threats of litigation from March 2011 to January 2012, Fortiustex dropped the matter without

1  responding to the offers Tradeline had extended and without obtaining any

2  compensation for its allegedly large losses.

3       80.    Yet more troubling is that in two September 2011 emails, Fortiustex's

4  Skovbon flatly states that the Association's Lewkowitz's *already* has agreed to

5  revoke Tradeline's Supima® license, although the Association had no proof of any

6  violations of the License Agreement by Tradeline; had not exercised any of the

7  procedures available to it to actually inspect and test Tradeline's products; had not

8  allowed Tradeline any chance whatsoever to establish that its yarn was 100 percent

9  Supima cotton; and had not even informed Tradeline its Supima® license was in

10  danger.

11       81.    Specifically, on September 19, 2011, Skovbon emailed Tradeline,

12  copying Lewkowitz, that "I will therefore *as allready* [sic] agreed with Marc now

13  ask Supima to withdraw your license to produce Supima yarns!" (emphasis added).

14  On September 28, 2011, Skovbon again emailed Lewkowitz, copying Palayam,

15  stating, "I will as already mentioned to you progress with my court case upon the

16  receipt of your [the Association's] withdrawal of their license."

17       82.    The Association's interaction with Fortiustex, a company that was *not*

18  licensed by the Association and which therefore should not have been allowed to

19  sell Supima® branded products, can scarcely be understood except as part of a plan

20  by the Association (which doesn't act on its own but as directed by its Board) to

21  harm a longtime and loyal licensee, Tradeline.

22       83.    It is possible that at some point Fortiustex became an active participant

23  in the conspiracy.  More likely, Jeff Elder – Boswell Co.'s Head of Marketing and

24  the Association's Chairman of the Board – who had had direct business discussions

25  with Fortiustex and Skovbon prior to March 2011, indicated to Skovbon that the

26  Association would be happy to assist him if he had any problems with Tradeline.

27  Skovbon then manufactured a product problem with Tradeline, and the

28

Case No. 2:15-CV-8048

COMPLAINT FOR ANTITRUST VIOLATIONS

Association's Lewkowitz opportunistically seized the chance to assist Fortiustex in disparaging Tradeline's products and good name.

84.     The Association's interaction with Fortiustex also establishes that, at minimum, Lewkowitz had informed Skovbon as early as September 2011 that the Association was intent on revoking Tradeline's license, strongly indicating the conspirators had decided to do so at that point in time if not earlier.

### 2.     The Association interferes with Tradeline's valuable potential contract with TIV.

85.     TIV is a significant textile merchant in Israel.

86.     In March 2011, after months of negotiations, TIV was ready to sign a contract for the purchase of 35 metric tons of Supima cotton yarn from Tradeline.

87.     During the negotiations, TIV asked Tradeline to allow it to hire local Indian contractors to inspect Tradeline's spinning facility in Chennai.  Tradeline refused to do so, as its production methods are confidential and proprietary, but urged TIV to contact the Association to confirm that Tradeline was a bona fide Supima® licensee.

88.     TIV did so.  The Association's response, like its secret testing for Fortiustex, can only be reasonably understood as part of a conspiracy to harm Tradeline.

89.     In response to TIV's inquiry whether the Association could confirm that Tradeline was a Supima® licensee, instead of sending a simple email confirming the accuracy of that fact, on May 4, 2011, the Association's President, Jesse Curlee, emailed TIV, without the courtesy of copying Tradeline:  "There is one small problem and it is your supplier . . . Tradeline [ellipsis in original].  We have received reports recently from several knitters/weavers who have questioned Supima yarn supplied by Tradeline in regard to it actually being Supima cotton.  In at least one instance we tested the cotton and it appears not to be Supima cotton.

*This is a serious violation of a Supima spinner licensee and we are in the process of taking action against Tradeline*" (emphasis added).

90.     TIV's response was understandable and immediate.  TIV emailed Tradeline the same day it received the Association's email:  "I was shocked and astonished to receive the below e mail that speaks for itself.  As I have informed from the start, we must have in this project 100% supima yarn with certificate.  As supima [the Association] is not confirming the certification due to the problems you are facing we are forced to cancel this project."

91.     On its face, Curlee's email to TIV is improper on several levels.

92.     First, Curlee did not copy the Association's licensee, Tradeline, before sending Tradeline's customer a communication that without any doubt would prevent the performance of the contract.  In other words, without any warning to Tradeline, the Association intentionally interfered with a profitable contract Tradeline was imminently to perform (earlier the same day that Tradeline received the TIV email, it had sent the TIV shipments to the docks in Chennai).

93.     Second, Curlee's reference to "several" albeit unnamed "spinners/weavers" who had "questioned" Tradeline's Supima cotton is either fabricated disparagement or unsubstantiated rumor.  If fabricated, the only conclusion one could draw is the Association had been instructed by one of more of its Directors to engage in business libel against Tradeline.   In the unlikely event there had been several "spinners/weavers" who in fact had "questioned" Tradeline's Supima cotton yarn, had the Association been acting in an impartial and good faith fashion, it would have alerted Tradeline to those "question[s]," allowed it to respond, and if still concerned about Tradeline's products, invoked the ample inspection and testing rights it had under the License Agreement.  Whether Curlee's reference to the "spinners/weavers" was fabrication or rumor-mongering, it was equally improper.

94.     Third, and most damaging to Tradeline, was Curlee's statement that "[t]his is a serious violation of a Supima spinner licensee and we are in the process of taking action against Tradeline."  At the time Curlee made this statement to Tradeline's customer, the Association had not in any way indicated to Tradeline there was any problem with its license, and it had no chain-of-custody test results pursuant to the License Agreement or otherwise to support this statement.

95.     No prospective customer is going to enter into a contract to buy licensed goods when the licensor informs them the licensee is in "serious violation" of the license agreement and the licensor is in the process of revoking the license. Curlee's email could only have had the intent, and had the result, of harming Tradeline's business and reputation.

3.     **Mitsubishi Living informs Tradeline that Uniqlo would not purchase Supima cotton yarn from Tradeline, but the stated rationale was demonstrably inaccurate, supporting an oral report that the Association had sent a communication similar to the one it sent to TIV to either Mitsubishi Living, Uniqlo or both**.

96.     On May 20, 2011, just two weeks after Jesse Curlee, President of the Association, had emailed TIV, Nishikawa of Mitsubishi Living emailed Tradeline, stating:  "We just got a call from ur garmet div.  They ifmed us Uniqlo had a internal meeting today.  Mr. Yani chairman of Uniqlo instructed not to go on with supima this time but they decided to proceed with regular cotton ne26/1 compact yarn.  It is due to the sudden fall of NY cotton price.  It is very much regret n shocked to know about that but we can not do anything at this moment" (all misspellings in the original).

97.     Nishikawa's statement of Uniqlo's rationale is demonstrably inaccurate.  Nishikawa had been negotiating on behalf of Mitsubishi Living/Uniqlo for the purchase of 700 tons of Supima cotton yarn from Tradeline to be shipped from June 2011 to December 2011 for use in the *2012* season.  Nishikawa regularly

had emailed that Uniqlo would be using upland, non-Supima cotton for the
Fall/Winter 2011 season, which it in fact did.  However, for its *2012* season, Uniqlo
in fact marketed a full line of Supima cotton garments.  Nishikawa's statement, that
Uniqlo would not be purchasing Supima cotton as anticipated from Tradeline
because of the fall of cotton prices (which only affected upland cotton while Supima
cotton prices remained stable), could not have been accurate because Uniqlo in fact
purchased Supima cotton fabric and garments for the 2012 season.

98.     A consultant for Uniqlo informed Tradeline that he had seen an email
from the Association, sent to either Mitsubishi Living or Uniqlo, or both, that
contained statements along the lines of those Curlee of the Association had sent to
TIV on May 4, 2011, i.e., that Tradeline had been shipping adulterated Supima
cotton yarn and the Association was about to revoke its license.

99.     The consultant's report that the Association had interfered with the
prospective Tradeline/Mitsubishi Living-Uniqlo contracts is supported by the fact
that after Nishikawa sent his May 20, 2011 email, he did not follow up with respect
to any of the other textile mills, such as AEON, Hansol and Fortune Essence, that he
had indicated wanted to enter into contracts with Tradeline for the purchase of
substantial amounts of Supima cotton yarn.

100.   Nishikawa also did not follow up with respect to the encouragement his
superior, Yanagawa, had given to Tradeline at the end of March 2011 about a
possible long term investment in Mitsubishi Living and Uniqlo in Tradeline.

**F.     Due To The Association's Disparagement Of Tradeline's Products
        And Tradeline's Subsequent Loss Of Business, Tradeline Is Unable
        To Fully Perform On Its Jess Smith Cotton Contracts, Triggering
        Jess Smith Cotton To Threaten To Have The Association Revoke
        Tradeline's License.**

101.   Tradeline lost Fortiustex as a client in part because of the Association's
breach of the License Agreement, lost TIV and Uniqlo as substantial potential
clients because of the Association's disparagement and its false representations that

it was in the process of revoking Tradeline's Supima® license, and lost a real and present potential for a long term joint venture with Mitsubishi Living and Uniqlo for the same reasons.

102.   The Association's misconduct was done with the knowledge, approval and at the direction of its Chairman, Jeff Elder, not in his role as Chairman attempting to guide the Association in a good faith fashion towards its appropriate goals, but rather through his misuse of the Association to further the goal of Boswell Co. to avoid price competition should Tradeline's Thesis and business plan succeed.

103.   Elder's and Boswell Co.'s participation in the conspiracy is supported by the additional fact that in 2011, Mitsubishi Living started exclusively buying Supima cotton from Boswell Co.  Elder realized if he used the Association to disparage Tradeline's product and business practices to Mitsubishi Living and raise the specter of Tradeline's Supima® license being revoked, he could shove Tradeline out of an important supplier relationship with Mitsubishi and instead gain a direct route for Boswell Co. to become Mitsubishi's sole supplier of Supima cotton.

104.   Jim Neufeld was a Director on the Association's Board at this time.  He was a cotton grower for Jess Smith Cotton and a member of Jess Smith Cotton's Board of Directors.

105.   At some point in the late spring or summer of 2011, Neufeld learned of the Association's campaign to push Tradeline into financial difficulty as a pretext for stripping its license.  While Tradeline's Thesis and business plan threatened Jess Smith Cotton's success as a cotton merchant, in the near term it was more important to Jess Smith Cotton that Tradeline perform on the contracts Tradeline had entered with Jess Smith Cotton in the fall and winter of 2010-2011 that called for Tradeline to purchase an aggregate of 1780 metric tons from Jess Smith Cotton.[4]

---

[4]   Tradeline entered into those contracts in order to have sufficient Supima cotton fiber supply to fulfil the 700 metric ton Supima yarn contracts it was

106.   Despite the economic harm Tradeline had suffered because of the Association's misconduct, it performed those contracts in good faith to the extent it could.  Specifically, between September 28, 2011 and February 14, 2012, Tradeline made 10 payments to Jess Smith Cotton totaling $580,056.49.

107.   In addition, it was not the case that Tradeline actually *received* Supima cotton from Jess Smith Cotton it had not paid for.  Rather, it had not "lifted" (paid for and taken possession) all the cotton called for by the contracts.  In other words, Jess Smith Cotton could have mitigated any contractual damages to zero simply by selling the cotton to other spinners or textile mills.

108.   In the summer of 2011, Neufeld began pressuring Lewkowitz and the Association to in turn pressure Tradeline to lift the cotton called for by the Jess Smith Cotton contracts.

109.   As a consequence, in July 2011, Lewkowitz made several telephone calls to Tradeline's Palayam to discuss Tradeline's failure to timely lift all the cotton called for by the Jess Smith Cotton contracts and to urge Tradeline to promptly do so.

110.   In August 2011, Lewkowitz traveled to Coimbatore, India (a city around 300 miles from Chennai) on Association business.  Despite Tradeline's offer, Lewkowitz did not visit Tradeline's office and factory in Chennai.  Nor did Lewkowitz seek to inspect or test any of Tradeline's Supima cotton yarns or make any inquiry about the Supima cotton yarn Tradeline had shipped to Fortiustex (although those issues remained live at the time).  Instead, at a face-to-face meeting with Palayam in Coimbatore, he again pressured Tradeline to lift all the cotton called for in its contracts with Jess Smith Cotton.  This was the first instance since Tradeline had been granted a Supima® licensee in 2008 that Lewkowitz had

_____

expecting with Mitsubishi Living/Uniqlo.  To produce 700 metric tons of Supima cotton yarn would have required over 1000 metric tons of Supima cotton fiber.

1   focused on specific contracts Tradeline had with a specific cotton merchant or

2   grower.

3       111.   Each of Tradeline's contracts with Jess Smith Cotton stated:  "THIS

4   CONTRACT IS GOVERNED IN ITS ENTIRETY BY THE RULES AND

5   REGULATIONS OF THE INTERNATIONAL COTTON ASSOCIATION ["ICA"]

6   UNDER ENGLISH LAW AND JURISDICTION."

7       112.    Beginning in October of 2011, Jess Smith Cotton, directly and through

8   its agent, Perfect Cotton, began threatening to institute ICA arbitration against

9   Tradeline.

10      113.   On October 14, 2011, Jess Smith Cotton emailed Tradeline:  "we will

11  be in attendance at ICA Dinner next week and have meeting arranged with President

12  and Chairman of the ICA in order to discuss this situation with Tradeline and seek

13  their advice how to handle.  This should show the seriousness of the situation and

14  another reason that [Tradeline] need[s] to hurry up and make some more payments."

15      114.   On October 21, 2011, Jess Smith Cotton emailed Tradeline that it had

16  met with ICA Directors in Liverpool, England "to discuss this matter and to get

17  some guidance about next steps we should take."

18      115.   On November 1, 2011, Jim Neufeld, the Jess Smith Cotton grower and

19  board member, and member of the Association's Board, emailed Palayam at

20  Tradeline, threatening that he would recommend to the Association Board that "your

21  license be reviewed" and to Jess Smith Cotton that it initiate an ICA arbitration.

22      116.   On November 4, 2011, Ernie Schroeder of Jess Smith Cotton emailed

23  Tradeline, stating in part:  "Tradeline needs to understand that Supima [Association

24  of America] is a grower owned and run operation.  While Marc [Lewkowitz] is an

25  important person within the company, he does not have decision powers over who is

26  allowed or not allowed to have a Supima license.  That decision is ultimately made

27  by the growers."

28

117.   Schroeder's November 4, 2011 letter also stated (although not referring to him by name) that Jess Smith Cotton grower and board member, Neufeld, was planning at the next Association Board meeting to move the Association to revoke Tradeline's Supima® license (although none of the events that would trigger a revocation of the license had occurred).  Schroeder warned that absent a substantial additional payment, there was "a very strong chance that the Supima Board will cancel the Tradeline Supima license."  Schroeder's letter demonstrates that Jess Smith Cotton could control the Association to do its bidding.  It also demonstrates that at this point, if not earlier, Jess Smith Cotton had joined the conspiracy of Boswell Co. and the Association to strip Tradeline of its Supima® license.

**G.**   **In Concert With Defendants, The Association Revokes Tradeline's License Through Procedurally Improper Means, Causing The Immediate Collapse Of Tradeline's Supima Cotton Business.**

118.   On January 7, 2012, Tradeline applied for a one-year addendum to its Supima® license.  (The Association's practice was not to enter into new contracts when the old license expired, but to enter into addenda continuing the original contract for one year.)

119.   In prior years, the Association approved the one-year addenda for Tradeline in a matter of days.

120.   However, in January 2012, over three weeks expired after Tradeline sent in its application with no word from the Association, despite follow-up emails from Tradeline on January 12, January 23 and January 24.

121.   On January 25, 2012, Lewkowitz responded on behalf of the Association.  He stated the Association had "accepted your renewal documents today and approved Tradeline for a Supima license in 2012."  However, he purported unilaterally to add conditions to the 2012 license that were not on the original License Agreement Tradeline had obtained in 2008, among them that "[i]f Tradeline is found in violation of contract terms and is placed on the default list

under ICA and ACSA rules, then the Supima license will immediately become null and void and Tradeline will need to cease and desist from using the Supima name, logo and trademark in any manner of its business."

122.   This condition purported to change the terms of the 2008 License Agreement in two ways.  One, the License Agreement made reference to the default lists of the ICA and the "ACEA", or the American Cotton *Exporters* Association. Lewkowitz had changed the arbitration body to be the ACSA, or the American Cotton *Shippers* Association.  More importantly, Lewkowitz inserted the new condition that being placed on a the default list under either ICA or ACSA rules would cause Tradeline's Supima® license to "immediately become null and void," in sharp contrast to the License Agreement, which gave Tradeline a 45 day cure period.

123.   Lewkowitz's January 25, 2012 response was a purported unilateral change to the License Agreement, which Tradeline never accepted and which was ineffective for that reason.

124.   What is more, when the Association provided the "Supima license certificate along with a fully executed copy of the license agreement addendum" on February 8, 2012, neither contained any of the new terms Lewkowitz purported to add to the License Agreement, including the putative provision that if Tradeline was placed on the default list under ICA or ACSA rules its Supima® license would "immediately become null and void."  Hence that purported provision never became part of the License Agreement.

125.   On February 14, 2012, and in furtherance of the conspiracy, Jess Smith Cotton emailed Tradeline, stating that it had filed default papers with the ACSA and sought immediate payment of $826,000.  On that same date, Tradeline received a letter indicating that Jess Smith Cotton had filed default papers with the ACEA.  As part of that filing, Jess Smith Cotton's Schroeder had stated that Tradeline "has not agreed to settle the dispute by arbitration."

126.   There were at least two aspects of the Jess Smith Cotton's ACEA filing that were procedurally improper.  One, each of the Jesse Smith Cotton contracts with Tradeline called out, in all capital letters, that any disputes arising from the contracts would be governed "IN THEIR ENTIRETY" by ICA arbitration.  Any dispute Jess Smith Cotton had with Tradeline over performance of their contracts should have been put to the ICA, not to the ACEA or the ACSA.  Two, Schroeder's statement that Tradeline "had not agreed to settle the dispute by arbitration" — a requirement for invoking the ACEA's jurisdiction — was simply false for the same reason:  *both* parties had agreed any disputes would be resolved exclusively by ICA arbitration.

127.   Under ACEA procedures, Tradeline had 14 days to respond to Jess Smith Cotton's default filing.  Tradeline did so on February 28, 2012.

128.   On February 29, 2012, the ACEA placed Tradeline on its default list.

129.   On March 1, 2012, the Association revoked Tradeline's Supima® license and informed Tradeline's three largest customers, who in the aggregate accounted for 75 percent of Tradeline sales.  Tradeline's Supima cotton business immediately collapsed.

130.   Jess Smith Cotton's doubly-defective (and perjurious) filing of the default papers with the ACEA, along with Lewkowitz's purported adding the provision to the 2012 one year addendum to the License Agreement that being listed on the ACEA default list would cause immediate revocation of Tradeline's Supima® license, directly caused the collapse of Tradeline's Supima cotton business.

131.   Had Tradeline been given 45 days to cure the procedurally irregular and therefore improper ACEA default notice, it would have done so.

132.   In February 2012, Tradeline's Palayam owned a one-third interest in a valuable piece of real estate in India.  He realized over $850,000 when the property was sold.

133.   Palayam's property on which he realized over $850,000 was in escrow scheduled to close more than a week before April 15, 2012, i.e., well before the 45 day cure period would have expired.  Had the Association given Tradeline 45 days to cure (as required by the License Agreement), or had Jess Smith Cotton filed the arbitration with the ICA (as required by its contracts with Tradeline), Tradeline would have been able to cure any default.

134.   More importantly, the only appropriate arbitral body to resolve Jess Smith Cotton's default request was the ICA.  Under the ICA procedures, a party is not put on its default list until *after* the arbitration is *concluded*.  An ICA arbitration takes a minimum of six months to over one year to conclude.  Hence, had Jess Smith Cotton filed its arbitration against Tradeline with the ICA, as it was contractually required to do, Tradeline would have had in effect a minimum of six months to cure its default.  Tellingly, having improperly short-circuited the ICA default period, Jess Smith Cotton then did file for arbitration before the ICA.  But it only did so in July 2012, four months after the conspirators had used improper processes to revoke Tradeline's Supima® license.  Tradeline has taken the position in the ICA proceedings that, having already invoked arbitration before another body, Jess Smith Cotton should not now be able to turn to ICA.

135.   The Association's revocation of Tradeline's Supima® license on March 1, 2012 was tainted with at least three indisputable procedural irregularities.  First, Lewkowitz's purported insertion into the 2012 license addendum that Tradeline being listed on the ACEA default list would lead to immediate revocation of the license was never agreed to by Tradeline and was not included in the actual addendum or certification the Association provided Tradeline.  Therefore, ACEA placing Tradeline on its default list had no legal effect and was a non-event.  Second, even putting that procedural irregularity to one side, Tradeline should have been given 45 days to cure, and had it been given 45 days to cure, it could and would have done so.  Third, had Jess Smith Cotton pursued arbitration before the

ICA, as it was contractually bound to, rather than going to ACEA or ACSA first, Tradeline would have had from six months to over a year to cure, and it would have done so.

136.   In short, this Complaint states an actionable *per se* illegal group boycott against Defendants and their unnamed co-conspirator, the Association, even without any allegations of a conspiracy to disparage Tradeline's products to the purpose of pushing it into financial distress, because it alleges Defendants' and the Association acted in concert to strip Tradeline of its Supima® license.

137.   Further confirming Jess Smith Cotton's control of the Association, on July 5, 2012, Jess Smith Cotton offered to procure a "temporary" license from the Association in order to allow Tradeline to "lift" containers of Jess Smith cotton at Chennai, but only if Tradeline paid in full for the ten containers first, emphasizing that the temporary license would not permit Tradeline to transact any other Supima related business.

### **RELEVANT MARKETS**

138.   *Northwest Whole Stationers v. Pacific Stationery*, 472 U.S. 284 (1985), and its progeny hold that when an industry association wrongfully expels a member or licensee, it commits a *per se* violation of Section 1 of the Sherman Act if the association either possesses "market power or exclusive access to an element essential for effective competition." *Id.* at 297-98. Here, the Association wrongfully expelled a licensee, Tradeline, by revoking its Supima® license. The Association's conduct was wrongful in that, in concert with Boswell Co. and Jess Smith Cotton, it did not allow Tradeline the procedural protections it should have enjoyed under the License Agreement. The Association's conduct was also independently wrongful in that, also in concert with Boswell Co. and Jess Smith Cotton, it disparaged Tradeline's products and interfered with its actual and potential valuable contracts, forcing it into financial difficulty, and then seized upon Tradeline's financial difficulty as a pretext to revoke its license.

139.   The Association possesses substantial market power in the market for the sale of Supima cotton by cotton growers and cotton merchants to spinners.

140.   One of the markets for which a Supima® license is "an element essential for effective competition" is the market for the sale of Supima cotton yarn to textile mills.

141.   The Supima® license is an essential element for a spinner, like Tradeline, to sell its Supima cotton yarn.

142.   Upland cotton is not an effective substitute for Supima cotton.  This is shown by the Association's own statements, and by the market reality that Supima cotton commands a substantial non-transient price premium over upland cotton at every stage in the delivery chain, i.e., as cotton fiber, as yarn, as fabric, and as a finished garment.

143.   There are other varieties of ELS (extra long staple) cotton, but these are also not effective substitutes for a variety of reasons.  The Association has directly stated that other ELS cottons are not an effective substitute for Supima cotton.  Its website states, "Often referred to as 'the cashmere of cottons,' Supima surpasses all other cottons in softness, strength, and brilliance of color";  "Supima cotton has become the cotton of choice among the world's fine-count yarn spinners"; and, "The Supima® trademark is your guarantee that the product contains Supima, the world's finest cotton.  *No other trademark can guarantee a product's luxury cotton content*" (emphasis added).

144.   The italicized sentence immediately above is significant.  The Association has existed since 1954.  The main objective of the Association has been to promote and *brand* American Pima (as Supima) cotton as a recognizable and iconic brand.[5]  The other ELS cottons of any substantial production — Egyptian

_____

5   For example, a two-page advertisement from the September 13, 2015 *New York Times Sunday Magazine* showed on the left page a close photograph of Brooks

Giza, Chinese Shinzia and Indian DCH — lack a registered trademark, a licensing program and such a long-term branding effort and, as a consequence (and as conceded by the Association's quotes above), are not considered effective substitutes by "the world's fine-count yarn spinners" or commercial consumers of Supima cotton products, such as Uniqlo.

145.   The lack of effective substitutes for Supima cotton becomes particularly clear if viewed from the perspective of a yarn spinner, such as Tradeline, when it considers specializing in a particular ELS cotton.  The Supima® trademark and license provides it immediate legitimacy as a purveyor of the world's finest cotton yarn.  Such legitimacy could not be earned through the use (without a license or trademark) of any other ELS cotton.

### *TWOMBLY* ALLEGATIONS

**A.**    **Legal Standard**

146.   A "plaintiff bringing a § 1 claim must first plead an agreement to restrain trade.  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007), the Supreme Court explained that such a plaintiff must plead 'enough factual matter (taken as true) to suggest that [the requisite] agreement was made.'  In other words, the complaint must contain 'enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.'  Id. at 557."  *SD3, LLC v. Black & Decker (U.S.) Inc*., No. 14-1746, 2015 WL 5334119, at *7 (4th Cir. Sept. 15, 2015).

147.   "Importantly, *Twombly*'s requirement to plead something 'more' than parallel conduct does not impose a probability standard at the motion to dismiss stage.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). . . .   When a court confuses probability with plausibility, it inevitably begins weighing the competing inferences

---

Brothers white button-down shirt and on the right page, a photograph of American Pima cotton, and the text:  "CHOSEN BY BROOKS BROTHERS to transform its most iconic product/SUPIMA/World's Finest Cottons".

that can be drawn from the complaint.  But it is not our task at the motion-to-dismiss stage to determine 'whether a lawful alternative explanation appear[s] more likely' from the facts of the complaint.  *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).  Post-*Twombly* appellate courts have often been called upon to correct district courts that mistakenly engaged in this sort of premature weighing exercise in an antitrust case." *SD3, LLC*, 2015 WL 5334119, at *8.

## B.   Conspirators' Financial Incentive To Conspire

148.   The Association, Boswell Co. and Jess Smith Cotton each had a plausible economic incentive to conspire.

149.   As alleged above, and as shown by Neufeld's email to Tradeline of November 1, 2011 and Jess Smith Cotton's emails to Tradeline of November 4, 2011 and July 5, 2011, the Association is not controlled by its employees, such as President Jesse Curlee or Executive Vice President Marc Lewkowitz, but by its Board, its cotton grower members and its cotton merchant members, in this instance especially Jess Smith Cotton.  Jess Smith Cotton promised Tradeline it could cause the Association to issue a "temporary" license, which does not exist in the normal course of the Association's business.  The Association, controlled by Jess Smith Cotton and Boswell Co., had an economic incentive to conspire to the same extent as Defendants Jess Smith Cotton and Boswell Co. had an incentive to conspire. Both companies had such an incentive.

150.   Jess Smith Cotton, a cotton merchant, buys cotton from growers and sells it to spinners or textile mills.  Tradeline's Palayam's Thesis was to go around middlemen like Jess Smith Cotton and buy directly from cotton growers, directly threatening the business model of cotton merchants through vertical integration, which would have increased competition, lowered price and improved quality.

151.   Jess Smith Cotton had also sold significant amount of cotton to Tradeline.  If Tradeline had successfully implemented its business model, its continuing need to buy cotton from Jess Smith Cotton would have decreased to zero.

If Tradeline's business model was publicly seen as successful and widely copied, Jess Smith Cotton would have been at risk of losing all its sales.

152. Jess Smith Cotton owns a financing company that provides loans to growers, the Southern California Cotton Financing Co. Tradeline's business plan also put that business at risk.

153. Boswell Co., the world's largest grower of Supima cotton, also had significant financial incentives to conspire. As the world's largest grower of Supima cotton, it had a vested interest in protecting the status quo.

154. Palayam's Thesis, if successfully executed by Tradeline and copied by others, would have led to greater competition in the sale of Supima cotton, thus driving down its price, in turn forcing Boswell Co., which directly sells most of its Supima cotton, to lower its own prices. By conspiring to revoke Tradeline's license, it protected itself against that potential price deterioration.

155. Boswell Co. also acts as a cotton merchant, both for its own cotton and cotton grown by other, smaller farmers, providing it the same financial incentives to conspire as Jess Smith Cotton had.

## C. <u>Defendants' Conduct Is Not Only Plausibly Seen As Concerted, It Is Difficult To Explain The Association's Conduct Absent Agreement With Defendants To Harm Tradeline.</u>

156. The Association's conduct alleged above makes little sense absent an agreement between it and those controlling its conduct (in this instance, Boswell Co. and Jess Smith Cotton) to harm Tradeline.

157. Fortiustex is not a Supima® licensee and was not in 2011. The Association's response to its request to test alleged Tradeline Supima cotton yarn (without any offer of a showing of chain of custody) should have been met with a curt request by the Association asking for an explanation why Fortiustex was selling Supima® branded fabric in light of its not being a licensee. Instead, the Association secretly tested the product Fortiustex provided in blind reliance on its provenance

being Tradeline, and then provided the non-licensee Fortiustex the test results, in effect providing it a hammer to bring down on Tradeline over alleged product deficiencies.  A neutral industry association, trying in good faith to protect its bona fide licensees, would have acted in the opposite manner.

158.   The Association telling Fortiustex in September 2011 that it had already decided to revoke Tradeline's license, without having given a word of notice to Tradeline there was any issue with its license, is again the opposite of what one would have expected if the Association had acted in good faith.

159.   Jesse Curlee's May 4, 2011 email to Tradeline's prospective customer, TIV, including his false statement that the Association was in the process of revoking Tradeline's license, is more of the same.  It cannot be plausibly explained as anything other than a direct attack on a licensee who was then in good standing with the Association.

**D.      Neither the Six Month Termination Provision In The License Agreement Nor The Association's Grant Of a New License in January 2012 Undermines The Strong Plausibility of Conspiracy.**

160.   One can imagine Defendants' "gotcha" response to the foregoing. Defendants might argue that it makes no sense that Defendants would conspire with the Association to revoke Tradeline's Supima® license when the License Agreement had a provision that allowed to the Association to terminate the license without cause on six months notice.  Defendants could argue it makes no sense that Defendants would conspire with the Association to have the Association revoke Tradeline's license when the Association had the unfettered contractual right to terminate the License Agreement without cause, albeit on six months notice.

161.   A related "gotcha" argument Defendants could be expected to make is that Tradeline's Supima® license expired on December 31, 2011.  It makes no sense, Defendants' putative argument would run, to allege a conspiracy between

Defendants and the Association to revoke Tradeline's license when all the Association needed to do was not issue a new license in January 2012.

162.   Neither argument has merit. They both ignore market realities and the essential purpose of the Association.  They also ignore Jess Smith Cotton's incentive not to have Tradeline's license pulled until it was persuaded no amount of coercion would force Tradeline to perform on its future cotton contracts with Jess Smith Cotton.

163.   As alleged above, Tradeline paid Jess Smith Cotton over $580,000 from September 28, 2011 through February 14, 2012.  Jess Smith Cotton would not have wanted Tradeline to lose its license with that kind of money flowing to Jess Smith Cotton until such time it decided the money flow had run out.

164.   The essential purpose of the Association is to use the Supima® trademark "to promote and market textile and apparel products made with 100% American Pima cotton.  Supima provides licensing agreements to textile mills, manufacturers and brands/retailers for the expressed purpose of promoting specific apparel and textile products in high-end retail outlets."

165.   Relatedly, Asia is the largest market for Supima cotton, fabrics and garments.

166.   It would have been strongly contrary to the Association's interests (and hence the interests of a grower like Boswell Co. or a cotton merchant like Jess Smith Cotton) to be seen as arbitrarily terminating the Supima® license of one of the largest Asian purchasers of Supima cotton.

167.   One illustration shows how strongly contrary to the Association's interests such an arbitrary termination would have been.  Assume the Association did not act to frustrate and prevent Tradeline's consummation of a significant long-term contract between itself and the Mitsubishi Living/Uniqlo joint venture in May 2011, and the parties had entered that contract.  It would have seriously undermined the Association with Uniqlo, the largest retailer consumer of Supima cotton

1  garments in the world, for the Association at that time to exercise its sixth month

2  notice to terminate.

3       168.   In a word, the Association needed cover.  The Association couldn't risk

4  being seen in its most important market, Asia, as having terminated one of the

5  largest and most innovative Asian purchasers of Supima cotton and producer of

6  Supima cotton yarn for no reason.  Rather, it needed to disparage Tradeline's

7  products, deprive it of important and profitable contracts, force it into financial

8  difficulty, and then use that financial difficulty as a pretext for stripping its license,

9  putting the Association in a public light not of having arbitrarily revoked the license

10  of a prosperous and innovative Asian licensee, but instead of having appropriately

11  acted to protect its members and the integrity of its product pursuant to long

12  established procedure.

13       169.   In short, the alleged conspiracy is not only plausible, it is the most

14  reasonable, if not the only reasonable, interpretation of the events which have led to

15  this Complaint.

## FIRST CLAIM FOR RELIEF:

## DAMAGES FOR COMBINATION OR CONSPIRACY

## IN RESTRAINT OF TRADE OR COMMERCE

### (15 U.S.C. §§ 1, 15)

20       170.   All paragraphs of this Complaint are incorporated herein by reference

21  as if fully set forth at length.

22       171.   Section 1 of the Sherman Act prohibits "[e]very contract, combination

23  in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce

24  among the several States." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (quoting 15

25  U.S.C. § 1).  Thus, to prevail on a claim under Section 1 of the Sherman Act, a

26  plaintiff must prove:  (a) there was a contract, combination, or conspiracy; that

27  (b) unreasonably restrained competition; and (c) affected interstate or foreign

28  commerce.

172.   The Association, Boswell Co., Jess Smith Cotton, and other co-conspirators agreed that they would act in concert and did act in concert to deprive Tradeline of important procedural protections it should have enjoyed with respect to its License Agreement with the Association, to disparage Tradeline's products, and to strip Tradeline of its license with the Association.

173.   Defendants' concerted action restrained trade by stamping out an innovative business model that would have lowered price and increased competition.

174.   Defendants' concerted action affected interstate and foreign commerce in the market for Supima cotton, Supima yarn, Supima fabrics and Supima garments.

175.   Defendants' contract, combination, and/or conspiracy is a *per se* violation of Section 1 of the Sherman Act.  Alternatively, their agreements and joint conduct resulted in substantial anticompetitive effects in the U.S. markets for (a) the sale of Supima cotton to spinners or cotton merchants and (b) the sale of Supima cotton yarn to textile mills.

176.   Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor…without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."  15 U.S.C. § 15.

177.   As a direct and proximate result of the aforesaid contract, combination, and/or conspiracy among Defendants and the Association, and the ongoing actions taken pursuant thereto, Tradeline has been injured in its business and property as follows:  (a) Tradeline has been unable to sell its Supima cotton products and has lost substantial income and profits as a result; (b) Tradeline has been precluded from business growth that it otherwise would have achieved; (c) Tradeline lost the entire

1 franchise value of its otherwise profitable and growing Supima cotton yarn business;

2 and (d) Tradeline has otherwise been injured in its business and property.

3      178.   As a result of these *per se* Section 1 violations, Plaintiff is entitled to

4 recover its actual damages in an amount exceeding $100,000,000, trebled, and the

5 costs of suit, including a reasonable attorney's fee.

6

7                         **PRAYER FOR RELIEF**

8      WHEREFORE, Tradeline asks this Court to enter judgment against

9 Defendants, their subsidiaries, affiliates, agents, servants, employees, attorneys, and

10 all persons in active conceit or participation with them, granting Tradeline the

11 following relief:

12      1.      A finding that the contract, conspiracy, combination, understanding,

13 and agreement by and among Defendants, and others, and the other actions alleged

14 above are in violation of Section 1 of the Sherman Act;

15      2.      A judgment in Tradeline's favor and against Defendants, jointly and

16 severally, in an amount according to proof, trebled, to compensate Tradeline for the

17 injuries it has sustained to its business and property as a result of Defendants'

18 violations of the antitrust laws and of Tradeline's statutory rights, all as provided for

19 under Section 4 of the Clayton Act (15 U.S.C. § 15);

20      3.      An award to Plaintiff of the costs of suit, including its reasonable

21 attorney's fees; and

22      4.      Such other and further relief as this Court and/or a jury may deem

23 proper and just, including exemplary damages.

24

25

26

27

28

Case No. 2:15-CV-8048
COMPLAINT FOR ANTITRUST VIOLATIONS

1    DATED:  October 14, 2015          Respectfully submitted,

2                                      QUINN EMANUEL URQUHART &
3                                      SULLIVAN, LLP

4

5                                      By _____
6                                          Dominic Surprenant (Bar No. 165861)
7                                          Michael L. Fazio (Bar No. 228601)
                                           Paul Slattery (Bar No. 285291)
8
9                                          Attorneys for Plaintiff,
10                                         TRADELINE ENTERPRISES PVT. LTD.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                  Case No. 2:15-CV-8048
                                        COMPLAINT FOR ANTITRUST VIOLATIONS

1

## **JURY DEMAND**

2        Under Fed. R. Civ. Proc. 38, Plaintiff demands a trial by jury of all issues

3    raised by this Complaint that are triable by jury, as is its right under the Seventh

4    Amendment to the Constitution of the United States and as given by statute.

5

6    DATED:  October 14, 2015              Respectfully submitted,

7                                         QUINN EMANUEL URQUHART &

8                                         SULLIVAN, LLP

9

10                                   By _____

11

12                                         Dominic Surprenant (Bar No. 165861)
                                           Michael L. Fazio (Bar No. 228601)

13                                         Paul Slattery (Bar No. 285291)

14                                         Attorneys for Plaintiff,
                                           TRADELINE ENTERPRISES PVT. LTD.

15

16

17

18

19

20

21

22

23

24

25

26

27

28